## BONG, PLAINTIFF IN ERROR, v. ALFRED S. CAMP-BELL ART COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 150. Argued April 15, 1909.—Decided May 24, 1909.

Under § 4952, Rev. Stat., as amended by the act of March 3, 1891, c. 565, 26 Stat. 1106, the assignee of an author of a painting is not entitled to copyright unless the author is a citizen of a country to the citizens of which reciprocal copyright privileges have actually been extended by proclamation of the President in conformity with § 13 of the act of March 3, 1891. The fact that the assignee is a citizen of such a country does not entitle him to copyright.

An assignee within the meaning of the copyright statute is one who receives a transfer not necessarily of the painting but of the right to multiply copies thereof, and such right depends not only upon the statute but is derived also from the painter, who must have the right to copyright in order to assign it.

A citizen of a country not in copyright relations with the United States under § 13 of the act of 1891 is not entitled to avail of the copyright because his country is a member of the Montevideo Union.

The provision in § 13 of the act of 1891, providing that the President on determining certain conditions extend the privileges of copyright to citizens of countries which are parties to a copyright union to which the United States may become a party is not directory and confers no rights independent of the President's proclamation.

Where a statute contemplates reciprocity of rights the President is the best fitted officer to determine whether the conditions on which reciprocity depends exist; and this court approves the construction given by the State Department and the Librarian of Congress to the copyright statutes as denying copyright protection to Peru, no proclamation extending copyright to the citizens of that country having ever been made by the President.

Where the head of a department of the Government is authorized to make regulations in aid of a law, he cannot make regulations which defeat it. Williamson v. United States, 207 U. S. 425.

The practice of disposing of cases on the opening of counsel is generally an unsafe method of procedure; the case should be developed by the evidence. Hoffman House v. Foote, 172 N. Y. 348, approved.

155 Fed. Rep. 116, affirmed.

THE facts, which involve the construction of the international and reciprocity provisions of the Copyright Act, are stated in the opinion.

*Mr. Max J. Kohler* for plaintiff in error:

The plain and unambiguous language of the act of March 3, 1891, confers copyright where the person applying for the same as proprietor or assign of the author or proprietor is a subject of a country with which we have copyright relations, whether the author be a subject of one of those countries or not.

Section 13 of the act of 1891 is satisfied if the "proprietor" or "assign" taking out the copyright is a citizen of a country with which we have copyright relations.

Section 4952, as amended in 1891, authorizes either the "author" or "proprietor" of a work or his "assigns," to copyright the same. The only limitation is in § 13, which provides that this shall only "apply to a citizen or a subject of a foreign state" as to which the President has issued his proclamation. There is no suggestion of any limitation to citizenship of country of production, and the only statute that had contained any such limitation, § 4971, was expressly repealed. The limiting of statutory copyright to work of Americans (*Yuengling* v. *Schile*, 12 Fed. Rep. 97) was expressly abandoned by Congress. *Werckmeister* v. *Pierce*, 63 Fed. Rep. 445; *Merriam Co.* v. *Dictionary Co.*, 146 Fed. Rep. 354; aff'd 208 U. S. 260; *Oliver Ditson Co.* v. *Littleton*, 62 Fed. Rep. 597.

The only case which seems to have considered the branch of the statute here involved is *Britannica Co.* v. *Werner Co.*, 135 Fed. Rep. 841, where Judge Lanning, in a case involving a book, paraphrased the statute as here contended for.

Since § 4952 was first enacted in the revision of July 8, 1870, the "proprietor" or "assign" of the author, as well as the author himself, has been permitted to take out a copyright in his own name. The act of 1870, expressly interpolated the word "proprietor" when paintings were first made copyrightable. 16 Stat. 212; Solberg on Copyright, 46; *Am. Tobacco*

*Co.* v. *Werckmeister,* 207 U. S. 284, 296, 299; affi'g 146 Fed. Rep. 375; *Werckmeister* v. *Pierce,* 63 Fed. Rep. 445, 449; *Werckmeister* v. *Springer Co.,* 63 Fed. Rep. 808; *Werckmeister* v. *Am. Lith. Co.,* 142 Fed. Rep. 827,830; aff'd 146 Fed. Rep. 377; *Mifflin* v. *White Co.,* 190 U. S. 260; *Lawrence* v. *Dana,* 4 Cliff. 1; *Parton* v. *Prang,* 3 Cliff. 537; *Callaghan* v. *Myers,* 128 U. S. 617, 658.

The copyright law contains at present no limitation as to country of production of the work and § 13 has nothing to apply to except the provisions of § 4952, amended at the same time this statute was adopted, and establishing the rights of persons to take out copyrights, either as "author," "proprietor" or "assign," and it seems obvious that the law requires merely that the person taking out the copyright must be a citizen of such country, irrespective of the nationality of the author.

The experience and legislation of the rest of the civilized world, antedating the framing of this act, led to the adoption by them of a policy protecting works published in a country, as well as those by native authors or artists, and it was undoubtedly the purpose of Congress to adopt such policy.

Public policy does not require a strict construction of our copyright protection to citizens or "proclaimed" authors. In fact it is the consensus of opinion abroad that it is unwise to pursue a retaliatory policy in copyright matters and certainly the United States cannot afford to welcome such policy. The British copyright commission of 1878 advised against such course with particular reference to the United States.

Something was said on the trial as to an alleged construction by the Librarian of Congress of our copyright laws against recognizing rights based upon assignments from authors who are citizens of countries not covered by proclamations. The fact of such construction is challenged; to counsel's own knowledge a copyright was granted after consideration of this question in 1901, some years before the copyright proclamation as to China, for a work by a Chinese author, the manuscript of

which had been assigned to an American, A. S. Taylor. The copyright bureau in fact has stated that the question is a doubtful one requiring determination. (Report on copyright legislation by the Register of Copyrights for the year ending June 30, 1903, pp. 10, 11). If there be any such construction it is obviously wrong and is not uniform, long established nor reasonable, so as to be entitled to any weight as an alleged departmental construction. *United States* v. *Graham,* 110 U. S. 219; *United States* v. *Tanner,* 147 U. S. 661. Nor, as he himself conceded, is the Librarian of Congress given any discretionary power, but he is a mere ministerial officer (Report cited, *supra,* pp. 31, 32).

Even before the international copyright law amendment of 1891, the proprietor of a painting who was himself a citizen or resident of the United States, could have secured a copyright, even though the artist may have been a non-resident alien, but the rule was different as to books and other articles enumerated in § 4971, because of the express provisions of that section.

But defendant argued below, chiefly on the assumption that Mr. Hernandez's assignment to Mr. Bong passed nothing, because Mr. Hernandez himself could not have secured a copyright under our statutes, under the act of March 3, 1891, because a Peruvian, and such is the reasoning of the Circuit Court of Appeals.

In the light of the laws of foreign countries and the Berne convention, which were carefully studied by the lawmakers, it seems obvious that the removal of an alien's lack of capacity to copyright was cured by assignment or descent from the alien; disability by assignment was expressly intended by Congress in the international copyright act, just as had been done in terms in foreign countries, where the limitation to native "authors" had been abolished.

The language of our copyright law is unmistakable and unambiguous in making right to copyright turn simply on the citizenship of the person taking out the copyright.

Mr. Bong, before he sought his Federal copyright, and published the painting under those limitations in photogravure reproductions, could have enjoined defendant's infringement as a violation of his common-law copyright rights, and in the Federal court, because of jurisdiction based on his alienage. The copyright act in exchange for publication, gave him a statutory copyright for a limited period, upon compliance with its terms.

The common-law copyright rights, before publication, of the painter or owner of a painting or other copyrightable objects, are of course well established. *Werckmeister* v. *Am. Lith. Co.*, 134 Fed. Rep. 321; aff'd 207 U. S. 284; *Parton* v. *Prang*, 3 Cliff. 537; *Werckmeister* v. *Am. Lith. Co.*, 142 Fed. Rep. 827; aff'd 146 Fed. Rep. 377; *Turner* v. *Robinson*, 10 Ir. Ch. Rep. 121, 510; *Oertel* v. *Wood*, 40 How. Pr. 10; *Prince Albert* v. *Strange*, 2 De Gex & Smale, 652; *Press Pub. Co.* v. *Monroe*, 73 Fed. Rep. 196; appeal dismissed, 164 U. S. 105; *Palmer* v. *De Witt*, 47 N. Y. 532; *Thomas* v. *Lennon*, 14 Fed. Rep. 849; *Iolanthe Case*, 15 Fed. Rep. 439; *Mikado Case*, 25 Fed. Rep. 183; *Globe Co.* v. *Walker*, 210 U. S. 356.

See also *Mansell* v. *Valley Printing Co.* (1908), 1 Ch. 198; aff'd (1908) 2 Ch. 441, in which the English court has held that as to paintings, the common-law copyright subsisted until publication, unlike printed books.

This rule of law as to common-law copyright is not limited in any way under the American authorities, to productions by American authors or painters. 7 Am. & Eng. Ency. of Law, 519; *Palmer* v. *De Witt*, 47 N. Y. 532; *Crowe* v. *Aiken*, 2 Biss. 208; *Keene* v. *Wheatly*, 14 Fed. Cas. 7,644; *Thomas* v. *Lennon*, 14 Fed. Rep. 849; *Tompkins* v. *Halleck*, 133 Massachusetts, 32; *French* v. *Maguire*, 55 How. Pr. 471; *Shook* v. *Daly*, 49 How. Pr. 366.

The convention with Germany referred to in the President's proclamation, specified in the complaint, requires a liberal construction in favor of the German assignee's rights.

The court's argument below that because colorable assign-

ments might be resorted to, the statute should be construed to deny copyright to works produced by citizens of countries outside the President's copyright proclamation, is untenable. *Carte* v. *Evans,* 27 Fed. Rep. 861; *Black* v. *Allen Co.,* 42 Fed. Rep. 618.

The direction of a verdict was not based, nor is it sustainable, on the theory that plaintiff, apart from the alienage question, had no copyrightable interest in the painting.

A transfer of common-law copyright in a painting entitles the transferee to take out a copyright, though he does not own the physical painting. This question was still doubtful when this case was tried below. *Am. Tobacco Co.* v. *Werckmeister,* 207 U. S. 284, 296–299; aff'g 146 Fed. Rep. 375.

An assignee of the American copyright rights is entitled in his own behalf to copyright the painting. Cases cited, *supra,* and *Goldmark* v. *Kreling,* 35 Fed. Rep. 651; *Merriam Co.* v. *United Dictionary Co.,* 146 Fed. Rep. 354; *Werckmeister* v. *Springer Co.,* 63 Fed. Rep. 808; *Palmer* v. *De Witt,* 47 N. Y. 541.

Such is the usual course with respect to transfer of American rights. Even if the copyright were held in part by him for the benefit of persons other than plaintiff, he would be entitled to take out the copyright in his own name. *Press Pub. Co.* v. *Folk,* 59 Fed. Rep. 324; *Lawrence* v. *Dana,* 15 Fed. Cas. 8,136; *Wooster* v. *Crane* 147 Fed. Rep. 515; *Goldmark* v. *Kreling,* 35 Fed. Rep. 661; 7 Am. & Eng. Ency. of Law, 2d ed., 545; *Mifflin* v. *White Co.,* 190 U. S. 260; *Ford* v. *Blaney Co.,* 148 Fed. Rep. 642; *Harper* v. *Donohue & Co.,* 144 Fed. Rep. 491, 494; *Osgood* v. *Felsenheld* (Imperial Court of Germany).

The construction placed by the State Department on § 13 of the act of March 3, 1891, is erroneous, and even Hernandez, as a subject of Peru, which country belongs to the Montevideo International Copyright Union, was entitled to a statutory copyright in his own right. *Morrill* v. *Jones,* 106 U. S. 466; *Campbell* v. *United States,* 107 U. S. 407, 410; *United States* v. *Dominci,* 78 Fed. Rep. 334; *Buttfield* v. *Stranahan,* 192 U. S. 470, 496; *Williamson* v. *United States,* 207 U. S. 425, 461.

*Mr. George Ryall* for defendant in error:

Hernandez, being a citizen and subject of Peru, could not have obtained a copyright in this country, and most assuredly he could not assign a right which never existed. *Werckmeister* v. *Springer Lith. Co.*, 63 Fed. Rep. 808; *Werckmeister* v. *Am. Lith. Co.*, 142 Fed. Rep. 827.

The Librarian of Congress has always construed our statute as denying to citizens of Peru copyright protection, and that the assignee of one who could not obtain a copyright could not obtain one; and it is respectfully submitted that this construction of the statute is most reasonable, well established, and entitled to great weight as a departmental construction. *United States* v. *Graham*, 110 U. S. 219; *United States* v. *Tanner*, 117 U. S. 661.

In answer to the first point on the brief of the plaintiff in error, the defendant calls attention again to the fact that the artist, Hernandez, when he assigned to the plaintiff Bong, had no assignable interest and that consequently the assignee Bong took nothing by the assignment. This position stands out clearly in *Werckmeister* v. *Pierce & Bushnell*, 63 Fed. Rep. 445–449.

MR. JUSTICE McKENNA delivered the opinion of the court.

This is an action under the copyright statutes to recover penalties and forfeitures for the infringement of a copyright of a painting.

The complaint shows the following facts: Plaintiff in error (as he was plaintiff in the trial court we shall refer to him hereafter as plaintiff, and to defendant in error as defendant) was a citizen and subject of the German Empire and resident of the city of Berlin, that nation being one which permits to citizens of the United States the benefit of copyright on substantially the same basis as its own citizens. It is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States may at its pleasure become a party, the existence of

.which condition has been determined by the President of the United States by proclamation duly made. April 15, 1892, 27 Stat. 1021. The defendant is a New Jersey corporation doing business in New York under the laws of the latter State.

In 1899 one Daniel Hernandez painted and designed a painting called "Dolce far niente," he then being a citizen and subject of Spain, which nation permits the benefit of copyright to citizens of the United States on substantially the same basis as its own citizens, as has been determined by the proclamation of the President of the United States. July 10, 1895, 29 Stat. 871. Prior to November 8, 1902, plaintiff became the sole proprietor of said painting by due assignment pursuant to law. About said date plaintiff applied for a copyright, in conformity with the laws of the United States respecting copyrights, before the publication of the painting or any copy thereof. Plaintiff inscribed, and has kept inscribed, upon a visible portion of the painting the words "Copyright by Rich Bong," and also upon every copy thereof. By reason of the premises, it is alleged, plaintiff became and was entitled for the term of twenty-eight years to the sole liberty of printing, reprinting, publishing and vending the painting. A violation of the copyright by defendant is alleged by printing, exposing for sale and selling copies of the painting under the name of "Sunbeam," by Hernandez, and that defendant has in its possession over 1,000 copies. By reason of the premises, it is alleged, and under § 4965 of the Revised Statutes of the United States, as amended by the act of March 2, 1891, defendant has forfeited the plates on which the painting is copied and every sheet thereof copied or printed, and $10 for every copy of the same in its possession and by it sold or exposed for sale, not more, however, than $10,000, whereof one-half shall go to plaintiff and the other half to the United States. Judgment of forfeiture is prayed.

Defendant answered, admitting that it was a corporation as alleged, and was doing business in New York. It denied, either absolutely or upon information and belief, all other allegations.

The court directed a verdict for the defendant, counsel for the plaintiff having stated in his opening, as it is admitted, that he would offer no evidence to establish the citizenship of Hernandez, and would not controvert the statement made by the defense that he was a citizen of Peru (it was alleged in the complaint that he was a citizen of Spain), as to which country the President had issued no copyright proclamation. It is also admitted that plaintiff never owned the "physical painting." There was introduced in evidence a conveyance of the right to enter the painting for copyright protection in America and the exclusive right of reproduction in colors and of engraving, etching, lithography, in black and in colors. The right of photography and reproduction by all photographic monochrome processes was reserved.

The ruling of the District Court, and that of the Court of Appeals sustaining it, were based on the ground that Hernandez, being a citizen of Peru and not having the right of copyright in the United States, could convey no right to plaintiff. Plaintiff attacks this ruling and contends that the act of March 3, 1891, "confers copyright where the person applying for the same as proprietor or assign of the author or proprietor is a subject of a country with which we have copyright relations, whether the author be a subject of one of those countries or not."

Whatever strength there is in the contention must turn upon the words of the statute conferring the copyright. Section 4952 of the Revised Statutes, as amended by the act of March 3, 1891 (c. 565, 26 Stat. 1106, 1 Sup. Rev. St. 951), reads as follows:

"The author, inventor, designer or proprietor of any book, map, chart, . . . painting . . . and the executors, administrators and assigns of any such person shall, upon complying with the provisions of this chapter, have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing and vending the same," etc.

Other sections prescribe the proceedings to be taken to secure copyright, and § 13 provides as follows (26 Stat. 1110):

"That this act shall only apply to a citizen or subject of a foreign state or nation when such foreign state or nation permits to citizens of the United States of America the benefit of copyright on substantially the same basis as its own citizens, or when such foreign state or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States of America may at its pleasure become a party to such agreement. The existence of either of the conditions aforesaid shall be determined by the President of the United States by proclamation made, from time to time, as the purposes of this act may require." 1 Sup. Rev. St. p. 954.

Plaintiff urges that he is "the 'assign' of the author and proprietor of the painting  .  .  .  and being himself a 'citizen or subject of a foreign nation' with which we have copyright relations," the condition of the statute is satisfied, and his copyright is valid, though Hernandez was not such citizen or subject. In other words, though the author of a painting has not the right to copyright, his assignee has if he is a citizen or subject of a foreign state with which we have copyright relations, these being, it is contended, the conditions expressed in § 13. Counsel's argument in support of this contention is able, but we are saved from a detailed consideration of it by the decision of this court in *American Tobacco Company* v. *Werckmeister,* 207 U. S. 284. In that case we said that "the purpose of the copyright law is not so much the protection and control of the visible thing, as to secure a monopoly, having a limited time, of the right to publish the production, which is the result of the inventor's thought." In considering who was entitled to such right under the statute we defined the word "assigns," as used in the statute. We said: "It seems clear that the word 'assigns' in this section is not used as descriptive of the character of the estate which the 'author, inventor, designer or proprietor' may acquire under the statutes, for the 'assigns' of any such person, as well as the persons themselves, may, 'upon complying with the provisions

of this chapter, have the sole liberty of printing, publishing and vending the same.'. This would seem to demonstrate the intention of Congress to vest in 'assigns,' before copyright, the same privilege of subsequently acquiring complete statutory copyright as the original author, inventor, dealer or proprietor," and there was an explicit definition of the right transferred as follows: "While it is true that the property in copyright in this country is the creature of the statute, the nature and character of the property grows out of the recognition of the separate ownership of the right of copying from that which inheres in the mere physical control of the thing itself, and the statute must be read in the light of the intention of Congress to protect these intangible rights as a reward of the inventive genius that has produced the work." In other words, an assignee within the meaning of the statute is one who receives a transfer, not necessarily of the painting but of the right to multiply copies of it. And such right does not depend alone upon the statute, as contended by plaintiff, but is a right derived from the painter and secured by the statute to the assignee of the painter's right. Of this the opinion leaves no doubt, for it is further said: "We think every consideration of the nature of the property and the things to be accomplished support the conclusion that this statute means to give to the assignees of the. *original owner of the right to copyright an article* [italics ours], the right to take out the copyright secured by the statute independently of the ownership of the article itself." The same idea was repeated when the court came to consider whether the exhibition of the painting, which was the subject-matter of the case, in the Royal Gallery, constituted a general publication which deprived the painter, as the owner of the copyright, of the benefit of the statutory provision. It was said.: "Considering this feature of the case, it is well to remember that the property of the author or painter in his intellectual creation is absolute until he voluntarily parts with the same." And the painter had the right of copyright, he being a subject of Great Britain, that country having copyright relations with

the United States. His assignee, Werckmeister, was also a citizen of a country having copyright relations with us. But it was the right of the painter which was made prominent in the case and determined its decision.

It was not an abstract right the court passed on, one that arose simply from ownership of the painting. It was the right given by the statute, and which, when transferred, constituted the person to whom it was transferred an assignee under the statute and of the rights which the statute conferred on the assignor. "It is the physical thing created, or the right of printing, publishing, copying, etc., which is within the statutory protection." It is this right of multiplication of copies that is asserted in the case at bar, and it is not necessary to consider what right plaintiff might have had under the common law "before he sought his Federal copyright and published the painting." See *White-Smith Music Co.* v. *Apollo Co.*, 209 U. S. 1.

It is next contended that Hernandez, as a subject of Peru, was entitled to a statutory copyright in his own right, because, as it is further contended, Peru belongs to the Montevideo International Union. This contention is based on the words of § 13, *supra*, which gives the right of copyright to a citizen or subject of a foreign state or nation when such state or nation "is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States of America may, at its pleasure, become a party to such agreement." If this were all there were in the statute, the contention of the plaintiff might have some foundation. The statute, however, provides that the existence of such condition "shall be determined by the President of the United States by proclamation, made from time to time, as the purposes" of the "act may require." It is insisted, however, that this provision is directory and a right is conferred independent of the action of the President, his proclamation being only a convenient mode of proving the fact. We cannot concur in this view, nor do the cases cited by plain-

tiff sustain it.  In *Morrill* v. *Jones,* 106 U. S. 466; *Campbell* v. *United States,* 107 U. S. 407; *Williamson* v. *United States,* 207 U. S. 425, this court decided that where the Secretary of the Treasury or Secretary of the Interior is authorized to make regulations in aid of the law, he cannot make regulations which defeat the law.  In *Buttfield* v. *Stranahan,* 192 U. S. 470, a regulation of the Secretary of the Treasury fixed the primary standard of imported tea, and was sustained as an "executive duty to effectuate the legislative policy declared in the statute."

It is admitted that the decision of the State Department is adverse to the contention, and, it is asserted by defendant and not denied by plaintiff, that the Librarian of Congress has always construed the statutes as denying to citizens of Peru copyright protection.  We think, besides, the statute is clear and makes the President's proclamation a condition of the right.  And there was reason for it.  The statute contemplated a reciprocity of rights, and what officer is better able to determine the conditions upon which they might depend than the President?

On the record, we think there was no error in directing a verdict on the opening statement of counsel.  We agree, however, with plaintiff that it is better to let a case be developed by evidence.  In *Hoffman House* v. *Foote,* 172 N. Y. 348, it was pertinently said: "The practice of disposing of cases upon the mere opening of counsel is generally a very unsafe method of deciding controversies where there is or was anything to decide."

*Judgment affirmed.*